**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

LAND'S END AT SUNSET BEACH
COMMUNITY ASSOCIATION, INC., a
Florida corporation,

                Plaintiff,

    vs.

ASPEN SPECIALTY INSURANCE
COMPANY, a Connecticut corporation,

                Defendant.

Case No.:

---

**COMPLAINT FOR DECLARATORY RELIEF
28 U.S.C. § 2201**

---

For their complaint, Plaintiff Land's End at Sunset Beach Community Association, Inc.

("Community Association") by and through its attorneys, alleges as follows:

**<u>NATURE OF THE ACTION</u>**

1.      This is an action for declaratory judgment arising under the Federal Declaratory

Judgment Act (28 U.S.C. §§ 2201 and 2202).

2.      Community Association seeks a declaratory judgment that: (1) its general

liability insurer, Defendant Aspen Specialty Insurance Company (hereafter "Aspen"), was

obligated to defend Community Association in the underlying litigation styled as *Land's End

at Sunset Beach Community Association, Inc. et al. v. Land's End Acquisition Corporation*,

8:16-cv-00828-EAK-JSS, United District Court for the Middle District of Florida, Tampa

Division (the "*Land's End Suit*"); and that (2) Aspen must reimburse Community Association

for all the defense expenses it incurred in the *Land's End Suit*, plus prejudgment interest at the

1

applicable legal rate from the date of invoice, as well as its fees and costs incurred in this coverage action.

## THE PARTIES

3.      Plaintiff, Community Association, is a corporation organized under the laws of the State of Florida. It maintains its principal executive offices and place of business at 7500 Bayshore Drive, Treasure Island, Florida 33706.

4.      On information and belief, Defendant Aspen is a Connecticut corporation with its principal place of business at 175 Capital Boulevard, Suite 300, Rocky Hill, Connecticut 06067.

## JURISDICTION

5.      This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Community Association and Aspen, and there is more than $75,000 in controversy in this action.

## VENUE AND CHOICE OF LAW

6.      Venue is proper in the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2). Community Association maintained its principal place of business in Florida when the Aspen's pertinent insurance policies were sold and issued and where Aspen delivered the policies to its insured, Community Association.

7.      Aspen sells insurance and defends lawsuits in Florida, including the Middle District of Florida.

8.     Under Florida's *lex loci contractus* choice of law rules, the place of policy issuance governs. Thus, Florida law governs Aspen's obligations to Community Association.

## THE ASPEN POLICY

9.     Aspen issued to Community Association a primary commercial general liability policy (No. CIUCAP001300-01) for policy period of May 15, 2015 to May 15, 2016, (the "Policy"), and renewed for the ensuing year for the policy period of May 15, 2016 to May 15, 2017.  A copy of the Policy is attached as **Exhibit "1."**

10.     The Policy provides coverage for "personal and advertising injury" arising out of an offense committed during the policy period, and requiring a defense of suits seeking "damages because of 'personal and advertising injury.'"

11.     "Personal and advertising injury" coverage under policy form CG 00 01 12 07 issued to Aspen provides:

> COVERAGE  B  PERSONAL  AND  ADVERTISING  INJURY LIABILITY
>
> 1. Insuring Agreement
>
>   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. . . .
>
> . . . .
>
> 2. Exclusions
>
>     This insurance does not apply to:
>
> . . . .

b. Material Published with Knowledge of Falsity [("Knowledge of Falsity Exclusion")]

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

i. Infringement of Copyright, Patent, Trademark or Trade Secret [("Intellectual Property Exclusion")]

"Personal and advertisement injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement."

However, this exclusion does not apply to infringement, in your "advertisement", or copyright, trade dress or slogan.

. . . .

SECTION V - DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For purposes of this definition:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   b. Regarding web-sites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

. . . .

14. "Personal and advertising injury" means injury . . . arising out of one or more of the following offenses:

. . . .

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement."

**[Policy, p. 6, 12, 14; Exhibit "1"]**.

## ACTIONS TAKEN AGAINST COMMUNITY ASSOCIATION BY LEAC AND ASPEN'S FAILURE TO RESPOND

**LEAC Sends Cease and Desist Letter Demanding Money from Community Association**

12.    In its correspondence to Community Association, dated September 29, 2015,

LEAC demanded that it cease and desist using the "Land's End" mark ("Cease and Desist

Letter"). A copy of the Cease and Desist Letter is attached as **Exhibit "2."**

13.    The Cease and Desist Letter asserted that:

> Our company has recently uncovered multiple media channels
> advertising lodging, overnight accommodations and resort services
> – all of which incorporate the name **Land's End** in connection with
> services provided by your Association and your members. It is clear
> you are marketing services which are the same as those covered by
> our registration above-identified. . . .
>
> My company regards its service mark rights as very valuable and
> intends to take whatever steps are necessary to protect those rights.
> . . .
>
> . . . .
>
> Accordingly, we call upon you to cease and desist and to advise us
> . . . what steps you intend to take to avoid further infringement. . . .
>
> Any continued use or advertising by you or your members of the
> name "**Land's End**" in connection with lodging accommodations,
> resort or travel services, or a similar name which incorporates
> Land's End in its title, will be immediately contested by my
> company.
>
> While we remain open to the possibility of a limited license to use
> the **Land's End** name, these discussions will not occur unless and
> until your company ceases and desists in your use in commerce of
> the name "**Land's End**" or "**Land's End Resort**" where such use
> violates our mark.

14.    A limited license to use the "Land's End" name could potentially avoid the

contested liability; thus, LEAC was calling for money payments from Community Association,

which was confirmed in a subsequent conversation with LEAC's principal who reiterated the demand, stating that the licensing fee would be affordable.

**Notice to Aspen and Aspen's Failure to Respond**

15.     After several communications between LEAC and representatives of Community Association to determine if this demand was real, and after meeting about the matter, on November 20, 2015, written notice was provided to Aspen ("Notice"). A copy of the Notice is attached as **Exhibit "3."**

16.     Community Association engaged counsel Susan Farley who, on numerous occasions, sent emails and personally spoke with Aspen's representative seeking information about their willingness to provide defense benefits.

17.     Beginning January 6, 2016, Suzanne White was the claims representative of York Risk Services Group, Inc. representing Aspen with regard to the Land's End matter.

18.     Between January 6, 2016 and June 2016, Ms. Farley had frequent communications with Ms. White via telephone and email regarding Aspen's coverage of this matter.

19.     Ms. White's first communication with Ms. Farley occurred on January 7, 2016. On this date, Ms. White sent to Ms. Farley, via email, a copy of the Lands' End at Sunset Beach's Commercial General Liability Policy with Aspen.

20.     On January 7, 2016, Ms. Farley sent an email to Ms. White summarizing the actions, to that point, which had been taken in the dispute with LEAC.  Additionally, in the same email message, Ms. Farley had expressed her relief that Aspen's policy appeared to cover this claim.

21.     On no occasion did Aspen or Ms. White ever definitively refute Ms. Farley's conclusions about coverage in writing.

22.     On January 8, 2016, Ms. White and Ms. Farley engaged in a conference call regarding the status of the dispute and the extent of coverage by Aspen.

23.     On January 11, 2016, Ms. Farley sent an email to Ms. White forwarding the contact information of Mark Beers, the claims adjuster for Farmers Insurance in the matter. Additionally, Ms. Farley forwarded previous communications between Ms. Farley and Mr. Beers.

24.     Later, on January 11, 2016, Ms. White represented to Ms. Farley that she had contacted Aspen directly about the matter and was waiting for their direction.

25.     Through further conversations, Ms. White represented to Ms. Farley that she had been seeking coverage for the efforts to defend, and had not yet received authorization to cover.  Ms. Farley understood that Aspen may not agree to defend absent a lawsuit, despite her numerous communications and requests with Aspen's claim representative, but a definitive answer had not been provided.

26.     Typical telephone conversations between Ms. Farley and Ms. White, included ones that did not lead to any formal statement by Aspen.

27.     Aspen provided no written or formal response for at least four months after notice was provided despite multiple requests for comments from its own claims representative, Ms. White.

28.     On March 2, 2016, Ms. White represented that she had not yet heard back from Aspen despite three separate requests for comments.  Ms. White further stated that she could

not proceed without direction from Aspen.  A copy of the email correspondence showing Aspen's failure to timely respond, dated March 2, 2016, ("White March Email") is attached hereto as **Exhibit "4**."

29.     On March 1, 2016, Community Association, through an email correspondence written by Ms. Farley, explained why action should be taken in defense of the LEAC Cease and Desist Letter ("Farley March Email"). Ms. White, representing Aspen, was copied on the correspondence.  A copy of the Farley March Email, which is a part of the White March Email, is attached as **Exhibit "5**."

30.     The Farley March Email states in part:

> . . . MacDermott [counsel for LEAC] did not accept our offer to avoid litigation on this . . . After two months of waiting for their response . . . and after prompting whether there will be a response, MacDermott only was forced to respond in mid-February after I wrote and said, apparently there is no response. Probably concerned that a DJ action would be filed, he immediately said they would have a response in the week, and blamed it on himself, not the client. Time is on their side and time is prejudicing my client. Their response then contained essentially a restating of the claim of priority over expansion on the internet, which is clearly not the law, and offering a resolution only if Resort Rentals will do business with and through Faulkner's yet to be launched internet site.

31.     Again, Aspen offered no response explaining whether Community Association was entitled to coverage.

**Responsive Declaratory Relief Action Filed by Community Association**

32.     On April 6, 2016, Community Association filed the *Land's End Suit* against Land's End Acquisition Corporation ("LEAC") seeking Declaratory Relief of Non-Infringement of Trademark Rights, here in the Middle District of Florida, Tampa Division. A

copy of the initial complaint ("Community Association Complaint"), excluding its attached exhibits, in the *Land's End Suit* is attached as **Exhibit "6."**

33.     In order to secure the preferred forum for resolution of this dispute, and to avoid paying license fees for a right to use a name, Community Association asserted that it had not infringed an existing trademark rights in declaratory relief action.

34.     As the Community Association Complaint states:

> 43.     Defendant, LEAC, has fulfilled its first threat and indeed is "not going away" and Land's End . . . [is] operating under fear of LEAC's persistent threat of litigation if they do not do business with it and accept its business offer. [LEAC]'s persistent threatening conduct has left [Community Association] in doubt of their legal rights to use the name LAND'S END.

**[Community Association Complaint, ¶ 43, p. 12; Exhibit "6"]**.

**Notice to Aspen and Aspen's Failure to Address the Community Association Complaint**

35.     Ms. Farley forwarded a copy of the Community Association Complaint to Ms. White on April 10, 2016.

36.     On May 16, 2016, Ms. Farley notified Ms. White via email about the counterclaim filed by LEAC on May 13, 2016, and forwarded the counterclaim to Aspen.  In the email, Ms. Farley represented that LEAC alleged advertising injury on the Internet in the counterclaim.  Additionally, Ms. Farley expressed her continued hope that coverage would be available.

37.     On May 23, 2016, Ms. White claimed that she had not received the original Community Association Complaint and requested receipt of said Complaint.

38.     Later, on May 23, 2016, Ms. Farley, through several email communications, sent the Community Association Complaint to Ms. White.  Ms. White confirmed receipt of the Community Association Complaint later that day.

39.     On May 24, 2016, Ms. White informed Ms. Farley via email that the declaratory judgment, complaint, and counterclaim had been forwarded to Aspen.

40.     In the same email, Ms. White further asked about Johnson, Pope and Bokor's role in the case.  Ms. Farley responded that they were the local counsel for the case.

41.     On May 27, 2016, Ms. White notified Ms. Farley, for the first time, that Aspen had denied coverage based upon certain exclusions within the policy.  Ms. White explained that Aspen did not consider the case to involve "Bodily Injury or Property Damage" and that the policy excluded trademark infringement suits.

42.     On May 27, 2016, Ms. Farley informed Ms. White, via email, that she would challenge the denial of coverage by Aspen based upon the fact that the case concerned an advertising injury over the Internet, not merely trademark infringement.  Ms. Farley requested that Aspen reconsider their position.

43.     On May 31, 2016, Aspen, through its authorized claims administrator, York Risk Services Group, Inc. ("York"), for the first time officially acknowledged receipt of Community Association's request for coverage ("Aspen May Denial Letter"). A copy of the Aspen May Denial Letter is attached as **Exhibit "7."**

44.     However, the Aspen May Denial Letter did not address the obligation to fund the Community Association Complaint despite their knowledge that such a request had been repeatedly made.  Instead, Aspen focused solely on the counterclaims. Nevertheless, the duty

to defend extended to all defensive activity, which would necessarily include the preparation of a defensive complaint in response to the Cease and Desist Letter from LEAC.

45.     Ms. Farley received the Aspen May Denial letter on June 7, 2016 via email from Ms. White.

46.     On June 10, 2016, Ms. Farley, on behalf of Community Association, sent a letter requesting reconsideration of Aspen's denial ("Farley June Reconsideration Letter"). A copy of the Farley June Reconsideration Letter is attached as **Exhibit "8."**

47.     In the Farley June Reconsideration Letter, Ms. Farley requested reconsideration of denial under the Community Association Complaint, stating:

> The claims against the Insured clearly seek damages because of "personal and advertising injury" to which the Policy applies.
>
> . . .
>
> The fact that the claimed damages/offense arise out of advertising is clear from the pleadings. Representative samples from the [Community Association] [C]omplaint . . . are listed below
>
> - LEAC has stated "Our company has recently uncovered ***multiple media channels advertising*** lodging, overnight accommodations, and resort services – all of which incorporate the name Land's End in connection with services[.]" Complaint (Dkt. 1), Exhibit L (LEAC letter of September 29, 2015).
>
> - LEAC has stated "Any continued use or ***advertising*** by you or your members of the nam[e ]'Land's End' … will be immediately contested by my company." Id.

**[Farley June Reconsideration Letter, p. 2; Exhibit "8"]**.

48.     Aspen, again, never addressed why coverage was not available for the Community Association Complaint.

### LEAC's Response and Counterclaim

11

49.     On May 13, 2016, LEAC filed an answer, counterclaims, and third party complaint in response to the Community Association Complaint ("LEAC Counterclaim"), a copy of which is attached as **Exhibit "9."**

50.     The fact allegations in the LEAC Counterclaims are the same as those that were subsequently alleged in an amended counterclaims and third party claim filed by LEAC on July 15, 2016 ("Amended Counterclaim"), a copy of which is attached as **Exhibit "10."** The specific claims made in the LEAC Counterclaims and Amended Counterclaims will be discussed below.

### Aspen's Denial of Defense of LEAC Counterclaim

51.     The Aspen May Denial Letter acknowledged receipt of the LEAC Counterclaims, and subsequently denied any duty to defend in wholly conclusory terms:

> . . . Based upon our review of the allegations outlined in the [LEAC Counterclaim], the plaintiff does not allege damages because of . . . "personal and advertising injury" caused by an "occurrence" or offense as those terms are defined in the Aspen policy . . .
>
> Should it be determined that "personal and advertising injury" is alleged in the [LEAC Counterclaim], there would still be no coverage due to:
>
> [the Knowledge of Falsity Exclusion **(Policy, Exclusion 2(b) p. 6)**; **Exhibit "1")** and the Intellectual Property Exclusion **(Policy, Exclusion 2(i) p. 6; Exhibit "1")**].
>
> Based on the . . . above, . . . it has been determined that the policy with Aspen does not provide coverage for this claim and as such, will not defend . . . Land's End . . . against the claims brought against them . . .

**[Aspen May Denial Letter; Exhibit "7"]**.

52.     The subsequent denials that Aspen issued, eliminated some of the initially asserted exclusions and thus, are no longer germane to coverage analysis here. The remaining allegations that Aspen contests are properly subject to defense duties because they fall within the scope of two distinct offenses: (d) for disparagement and (g) for infringement of slogan.

53.     In response to Aspen's denial in the Aspen May Denial Letter, the Farley June Reconsideration Letter states the facts from LEAC Counterclaims that support why coverage is owed to Community Association:

> The claims against the Insured clearly seek damages because of "personal and advertising injury" to which the Policy applies.
>
> . . . .
>
> The fact that the claimed damages/offense arise out of advertising is clear from the pleadings. Representative samples from the complaint, answer, and counterclaims are listed below
>
> - LEAC has stated that defendants "*advertise their condominiums* using the LAND'S END mark for short-term rentals." Answer, Counterclaims, and Third Party Complaint (Dkt. 12) at 13, ¶7.
>
> - LEAC has stated that defendants "have used and are currently using the LAND's END marks in *promoting and marketing their services*[.]" Id. at 17, ¶24 and at 18, ¶ 30.
>
> - LEAC has stated that defendants "*advertise the availability of real property*[.]" Id. at 4, ¶ 21.
>
> - LEAC has stated that defendants "provide rental services, including *advertising the location, description and availability* for rental of Community Association's condos in *various media, including on the internet*." Id. at ¶22.

**[Farley June Reconsideration Letter, p. 2; Exhibit "8"]**.

54.     The Farley June Reconsideration Letter further addresses why Aspen is incorrect in applying the Knowledge of Falsity Exclusion:

> The pleadings are devoid of any facts that any material was published with knowledge of falsity. . . . This exclusion is most commonly invoked in different types of litigation, i.e., those involving claims of defamation, slander, . . . or other reputation and privacy invasion torts. None of the foregoing are alleged in the instant case.
>
> . . . .
>
> York has provided no facts or other substantiation for its position that the exclusion based on "materials published with knowledge of falsity" should be applicable, and York's denial of the Insured's Claim on this basis is wrongful.

**[Farley June Reconsideration Letter, p. 3; Exhibit "8"]**.

55.     The Farley June Reconsideration Letter explained why Aspen is incorrect in applying the Intellectual Property Exclusion:

> Although LEAC alleges claims of self-servingly labeled as 'trademark infringement', this does not automatically obviate York's duty to defend.
>
> It is a well-known fundamental of insurance law that facts, not labels, must drive coverage determinations. In this case. . . the facts show that the Insured uses the term "Land's End" in a nominative and descriptive, non-trademark manner as part of its trade name, internet domain name, and in advertising generally, and these facts are alleged in the pleadings. LEAC's claims arise, at least in part, directly from these non-trademark uses, and the Policy's trademark exclusion is inapplicable to trade name or domain name usage. Moreover, LEAC also states a claim for unfair competition under Florida common law. The exclusion for "trademark infringement" must be narrowly construed and not read more broadly to apply to other claims that are distinct from trademark infringement.

**[Farley June Reconsideration Letter, p. 3–4; Exhibit "8"]**.

56.     On July 25, 2016, Aspen issued another denial letter ("Aspen July Denial Letter"), a copy of which is attached as **Exhibit "11."**

Coverage for this claim is denied because the damages alleged in LEAC's Counterclaim[s] do not fall within the scope of coverage found in the insuring clause of the Policy. . . .

Based on the facts alleged, LEAC's Counterclaim[s] do not contend the Association is using LEAC's idea in its advertisement. Nor does LEAC assert the Association is infringing upon LEAC's copyright, trade dress or slogan in its advertisement. Instead, LEAC is claiming injury based on its alleged trademark. . . .

. . . .

Even in the event it is found the Policy covers the alleged trademark injury LEAC alleges, . . . LEAC's counterclaim[s] revolves solely on trademarks owned by LEAC. . . . As such, the allegations revolve around the alleged infringement of trademarks by the Association and are thus excluded.

. . . Counts I . . . of the Counterclaim explicitly allege[s] trademark infringement. Thus, as the policy explicitly excludes trademark infringements, the causes of action in Count[] I . . . fall within the policy exclusions.

. . . .

. . . As Count II of the Counterclaim revolves around LEAC's alleged valid mark, and the policy explicitly excludes trademark infringement and other intellectual property rights, the type of suit being brought by LEAC is excluded from coverage.

Lastly, Count IV of the Counterclaim alleges unfair competition under Florida common law.

. . . .

[T]he claims for common law unfair competition are **ultimately based** on infringement of an excluded trademark and/or other intellectual property rights, . . . Count IV is therefore excluded by both the "trademark" and the "intellectual property rights" language per the policy exclusion. (emphasis added).

**[Aspen July Denial Letter, p. 4–7; Exhibit "11"]**.

57.     Aspen's denial letter provides no explanation for why express coverage under offense (9) claims of "infringement of . . . slogan in your 'advertisement,'" which encompasses trademarked slogans, does not fall within that express exception to the Intellectual Property Exclusion.   Nor does Aspen's analysis consider a possible world consistent with LEAC's counterclaim allegations where, based on consumer confusion, it is not predicated and creates liability independent from the distinctly asserted trademark infringement claims.

### LEAC's Amended Counterclaim Against Community Association

58.     On July 15, 2016, LEAC filed its Amended Counterclaim, and included the following allegations:

[LEAC's Claims to Ownership of "Land's End" Marks]

34.     LEAC is the owner of United States Trademark Registration No. 1,672,200 for the mark LAND'S END which issued January 14, 1992, and has a first use in commerce of December 1961 in International Class 042 for "HOTEL SERVICES." . . . This registration is now incontestable. . . .

35.     LEAC is the owner of the United States Trademark Registration No. 2,301,790 for the mark LAND'S END RESORT which issued December 21, 1999, and has a first use in commerce of June 1981 in International Class 042 for "RESORT HOTELS." . . . This registration is now incontestable. . . .

36.     LEAC is the owner of United States Trademark Registration No. 4,005,465 for the mark LAND'S END which issued August 2, 2011, and has a first use in commerce of June 1999 in International Class 39 for "ON-LINE TRIP AND TRAVEL RESERVATION SERVICES; ON-LINE TRANSPORTATION RESERVATION AND TRAVEL TICKET RESERVATION SERVICES; PROVIDING AN ON-LINE COMPUTER DATABASE IN THE FIELD OF TRAVEL INFORMATION SERVICES" and a first use in commerce of September 2009 in International Class 042 for ON-LINE WEB BASED SOFTWARE SERVICES, NAMELY, HOSTING COMPUTER SOFTWARE APPLICATIONS FOR THE HOSPITALITY, RECREATIONAL

AND TRAVEL INDUSTRIES, NAMELY, SOFTWARE FOR TRAVEL RESERVATIONS AND BOOKINGS, MANAGEMENT OF INVENTORY, SALES REPORTING AND PAYMENT TRANSACTIONS." . . . .

37.     LEAC uses these marks in part for hotel services related to its renowned Land's End hotel in Homer, Alaska, the first use of which can be traced back all the way to the hotel's opening in 1961.

. . . .

39.     Since before 1980, LEAC's predecessor in interest engaged in, and LEAC continued to engage in, extensive, nationwide advertising of the Land's End hotel, including in the Middle District of Florida.

40.     LEAC's and its predecessor's nationwide advertising featuring the LAND'S END mark began before Community Association was registered with the state of Florida, and has continued, uninterrupted to this day.

41.     Since approximately 1980, Land's End hotel has hosted guests from the Middle District of Florida.

42.     LEAC, through its website lands-end-resort.com, offers online booking and reservations for the Land's End Hotel and Land's End Lodges Condominiums.

43.     LEAC's website is accessible from everywhere in the country, including the Middle District of Florida.

44.     LEAC has engaged in significant policing efforts to enforce its rights in the LAND'S END marks. . . .

. . . .

**[Amended Counterclaim ¶¶ 34–37, 39–44, p. 7–9; Exhibit "10"]**.

[Claims Against Community Association]

47.     . . . LEAC . . . began their national advertising campaign using the LAND'S END marks for short-term rental services that include and/or are related to hotel services, resort services, and other similar services before Community Association

first used the LAND'S END mark on a purportedly national basis .
. .

48.      . . . Community Association did not use the LAND'S
END mark on the internet for short-term vacation rentals before the
issuance of the '200 Registration or the '790 Registration. . . .

. . . .

50.      Community Association uses the LAND'S END
mark in connection with condominiums that are leased as short term
vacation accommodations in the same way that hotel rooms are
leased as short term vacation accommodations. Community
Association has admitted that its condominiums are rented through
the use of "vacation rental organizations" such as Resort Rentals. . .
.

. . . .

52.      . . . Community Association appears to use the
LAND'S END mark alone, as a trademark, not descriptively,
without the proper full name of the property . . . in connection with
short-term room rental services that include or are related to hotel
services, resort services, and offer . . . online short-term reservations,
and other similar services. This use of the LAND'S END mark
creates a likelihood of confusion with LEAC's LAND'S END
marks for the same or similar and related goods and services.

**[Amended Counterclaim ¶¶ 47–48, 50, 52, p. 10–12; Exhibit "10"]**.

[LEAC's Counts of Action]

[Count I – Trademark Infringement Under Lanham Act]

. . . .

90.      . . . Counterclaim-Defendants . . . have used and are
currently using the LAND'S END marks in promoting and
marketing their services, thereby creating a likelihood of confusion
as to the source of origin, affiliation, approval or sponsorship of such
services.

. . . .

95.      . . . [T]he Counterclaim Defendants . . . are using the
identical mark on the same and/or related goods and services and in
connection with the same class of customers as alleged in detail
above.

96.    . . . Counterclaim Defendants . . . advertise their short-term vacation rentals online, as does LEAC, and uses the same mark, LAND'S END, for the same or related services, geared toward the same customers.

. . . .

99.    LEAC has been damaged by Counterclaim-Defendants' . . . trademark infringement by reason of the likelihood that customers, potential customers, and business partners are confused as to the source or affiliation, sponsorship or approval of Counterclaim-Defendants' and Third Party Defendants' services and activities and the relationship of such activities to LEAC.

. . . .

[Count II – False Designation of Origin Under Lanham Act]

. . . .

104.    The above-cited acts by Counterclaim-Defendants . . . constitute false designation of origin in violation of 15 U.S.C. § 1125 in that Counterclaim-Defendants and Third Party Defendants have used the LAND'S END marks in promoting and marketing their services, thereby falsely designating the source of origin, affiliation, approval or sponsorship of such services.

105.    LEAC has been damaged by Counterclaim-Defendants' . . . false designation of origin by reason of the likelihood of confusion as to the source or affiliation, sponsorship or approval of the Counterclaim-Defendants' and Third Party Defendants' services and activities and the relationship of such activities to LEAC.

. . . .

108.    . . . Counterclaim-Defendants' . . . acts of false designation and origin have been willful and taken without regard to the established rights of LEAC.

. . . .

[Count IV – Unfair Competition Under Florida Common Law]

113.    Counterclaim-Defendants' . . . use of the LAND'S END mark to refer to properties within the Sunset Beach complex without using their full name of "Land's End at Sunset Beach" or "Land's End at Treasure Island," with constructive and/or actual knowledge of LEAC's incontestable federal trademark rights, is

deceptive conduct within the meaning of the term as defined by Florida common law.

114. LEAC has been damaged by Counterclaim-Defendants' . . . unfair competition by reason of the likelihood of confusion as to the source or affiliation, sponsorship or approval of Counterclaim Defendants' . . . services and activities and the relationship of such activities to LEAC.

**[Amended Counterclaim ¶¶ 90, 95–96, 99, 104–105, 108, 113–114, p. 21–26, 28; Exhibit "10"]**.

### Aspen's Denial of Defense Under Amended Counterclaim As To The Community Association

59. On July 20, 2016, Community Association, through its counsel Susan Farley, sent an email requesting that Aspen approve coverage in light of the LEAC Amended Counterclaim filed by LEAC ("Farley July Email"). A copy of the Farley July Email is attached as **Exhibit "12**.**"**

60. The Farley July Email states in part:

You will see the (counter) complaint alleges that the tortious acts of 'advertising' over the internet causes the alleged harm. They also allege the advertising is not the full identity of the association, thus alleging that the term is not recognized as a trademark but rather an idea or unofficial slogan.

It is our position that these claims are clearly within the coverage language without exception. **We, again, tender the defense of this action to each of the following insurance companies notified herein: (1) Aspen** . . .

61. On October 11, 2016, Aspen, through the law firm Sioli Alexander Pino, sent Susan Farley another denial letter in light of the LEAC Amended Counterclaim ("Aspen October Denial Letter"), a copy of which is attached as **Exhibit "13**.**"**

62. The Aspen October Denial Letter states in part:

> After carefully reviewing . . . the [LEAC] Amended
> Counterclaim . . . Aspen . . . must deny coverage for this claim.
> The five counts alleged in the Amended Counterclaim against
> the [Community] Association continue to allege federal
> trademark claims, which are excluded under the terms of the
> [Aspen] Policy.

63.     Aspen has refused to apply the proper potential for coverage analysis presuming

an indemnity, not a duty to defend, contrary to the principles of Florida coverage law. Reading

the counterclaim as it if it were a judgment for liability, Aspen failed to recognize the defense

duty that arose.  Thus, Community Association in the *Land's End Suit* was forced to retain and

pay counsel to defend the LEAC Counterclaim, prosecute the defensive declaratory relief

against LEAC, and strongly contest the substantive allegations, which led to a settlement where

Community Association paid no monies to LEAC.

### DISTINCT ALLEGATIONS OF UNFAIR COMPETITION ESTABLISH A POTENTIAL FOR COVERAGE UNDER OFFENSE (f) "USE OF ANOTHER'S ADVERTISING IDEA IN YOUR 'ADVERTISEMENT'"

#### A Four-Element Test Applies to This Offense

64.     The Policy defines "Personal and advertising injury" as containing three

elements relevant here: (1) "use of another's;" (2) "advertising idea;" (3) "in your

'advertisement.'"   Each element is met by the allegations of the *Land's End Suit*, thereby

triggering Aspen's duty to defend Community Association.

#### Element One Is Met:  "Use of Another's"

65.     The policy language "use of another's advertising idea in your 'advertisement'"

does not limit it to the taking of an advertising idea of the claimant suing the insured.

66.     Coverage also cannot be limited to wrongful use or taking because those words

do not appear in the policy.

67.     The LEAC Amended Counterclaim alleges Community Association used LEAC's trademark protected mark LAND'S END to promote its rental homes. **[Amended Counterclaim ¶ 50, 52, p. 11–12; Exhibit 10]**.

68.     Therefore, LEAC's claims against Community Association for using LEAC's mark meets the first element of listed offense (f).

### Element Two Is Met: "Advertising Idea"

69.     The Policy has defined "advertising" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters."

70.     "Advertising idea" thus can mean any idea or concept related to the promotion of a product to the public.

71.     LEAC alleges that "the Counterclaim Defendants . . . are using the identical mark [Land's End] on the same and/or related goods and services and in connection with the same class of customers as alleged in detail above." **[Amended Counterclaim ¶ 95, p. 23; Exhibit 10]**.

72.     The principal reason for such alleged use of "Land's End," in advertisements for short term vacation accommodations is to encourage individuals to lease Community Association's condominiums.

73.      It can further be inferred from the LEAC Amended Counterclaim that "Land's End" is an advertising idea that LEAC is trying to protect.

74.     This is further supported by LEAC's efforts in obtaining trademark protection over the phrase, and through its fierce intervention on anyone who attempts to use the mark. [*See* **Amended Counterclaim ¶¶ 34, 36, 92, p. 7–8, 22; Exhibit 10**].

75.     The *Land's End Suit* satisfies the "advertising idea" element.

### Element Three Is Met: "In Your 'Advertisement'"

76.     Because the element of "advertising idea" in the "advertisement" definition, the allegations quoted above also satisfy this element.

77.     The "in your" advertisement element is like the "in the course of" causation element in the prior 1986 ISO CGL policy form that required "advertising injury" be caused by an offense "committed in the course of advertising [the insured's] goods, products or services."

78.     The "use of another's" offense makes the causal nexus evidence by emphasizing that the use of another's advertising idea merely must take place "in the insured's advertisement."

79.     The Aspen Policy does not require that injury be caused by advertising, since an injury need only arise out of the offense which constitutes "advertising injury." There is no requirement in the policy language that the advertising directly cause injury.

80.     LEAC alleges that it "has been damaged by [Community Association's] trademark infringement" **[Amended Counterclaim ¶ 99, p. 24; Exhibit 10]** because of Community Association's use of "the LAND'S END mark in connection with condominiums that are leased as short term vacation accommodations . . ." **[Amended Counterclaim ¶ 50, p. 11; Exhibit 10]**.

81.    All three elements of offense (f) have been met; thereby, enabling Aspen's duty to defend.

## ALLEGATIONS OF INFRINGEMENT OF TRADEMARKED SLOGAN COVERAGE UNDER OFFENSE (g) "INFRINGEMENT UPON ANOTHER'S SLOGAN IN YOUR 'ADVERTISEMENT'"

### A Three-Element Test Applies to This Offense

82.    The offense of "infringing upon another's slogan in your 'advertisement'" includes three elements: (1) infringing upon another's (2) slogan (3) in your "advertisement."

### Element One is Met: "infringing upon another's"

83.    LEAC explicitly claims infringement by Community Association upon LEAC for use of the phrase "Land's End:"

> 99.       LEAC has been damaged by Counterclaim-Defendants' . . . trademark infringement by reason of the likelihood that customers, potential customers, and business partners are confused as to the source or affiliation, sponsorship or approval of the Counterclaim-Defendants' . . . services and activities and the relationship of such activities to LEAC.

### Element Two is Met: "Slogan"

84.    The Policy does not define "slogan."

85.    The plain meaning dictionary definition is "a **distinctive** cry, **phrase**, or motto **of any** party, **group**, manufacturer, or person; catchword or catch phrase." (emphasis added).

86.    LEAC Amended Counterclaim implies that its mark "Land's End" is specific to LEAC's room rental services:

> 37.       LEAC uses these marks in part for hotel services related to its renowned Land's End hotel in Homer, Alaska . . .

> 39.       . . . LEAC's predecessor in interest engaged in, and LEAC continues to engage in, extensive, nationwide advertising of the Land's End hotel . . .

**[Amended Counterclaim ¶¶ 37, 39, p. 8–9; Exhibit 10]**.

87.     The LEAC Amended Counterclaim alleges that Community Association has used the mark in a similar manner:

> 50.     Community Association uses the LAND'S END mark in connection with condominiums that are leased as short term vacation accommodations in the same way that hotel rooms are leased as short term vacation accommodations. **[Amended Counterclaim ¶ 50, p. 11; Exhibit 10]**.

88.     The LEAC Amended Counterclaim further alleges that the twenty-plus individuals it named as Third Party Defendants ("Third Party Defendants") have used the mark as a nickname or "slogan" rather than as a trademark. As an example, one allegation states:

> 81.     . . . Third Party Defendant Land's End 10-404, LLC advertised . . . short-term rental services that included hotel services, online short-term reservations, and other similar services, for the condo that it owns, Building 10 #404, on ResortRentals.com **using the LAND'S END mark alone without using the full name of the condo property, "Land's End at Sunset Beach." [Amended Counterclaim ¶ 81, p. 20; Exhibit 10]** (emphasis added).

89.     The omission of any trademark reference against Third Party Defendant 10-404 LLC in paragraph 81 of the Amended Complaint evidences that LEAC's claims against the Third Party Defendants were based on "Land's End" used as a distinctive phrase describing the Community Association condominium complex rather than as trademark infringement.

90.     Thus, the phrase "Land's End" may be considered a slogan distinctively identifying trademark owner LEAC in connection with its short term vacation accommodations (hotel), and subsequently used by Community Association and named Third Party Defendants.

### Element Three is Met: "In Your 'Advertisement'"

91.     As already established above, "in your 'advertisement'" has been met.

92.     LEAC alleges that the Community Association's use of LAND'S END in their advertisement caused them injury.

> 104.    The above-cited acts by Counterclaim-Defendants . . . constitute false designation of origin in violation of 15 U.S.C. § 1125 in that Counterclaim-Defendants . . . have used the LAND'S END marks in promoting and marketing their services, thereby falsely designating the source of origin, affiliation, approval or sponsorship of such services. **[Amended Counterclaim ¶ 104, p. 25; Exhibit 10]**.

93.     A potential for coverage thus exists under offense (g), for which Aspen has a duty to defend.

## DISTINCT ALLEGED ADVERTISEMENTS OCCURRED WITHIN ASPEN POLICY PERIOD

### The Aspen Policy Additional Insured Endorsement

94.     The Policy extends express coverage for individual condominium unit owners as additional insureds ("Additional Insureds Endorsement"). A copy of the Additional Insureds Endorsement is attached as **Exhibit "14."**

95.     The Additional Insureds Endorsement, form CG 20 04 11 85, states in part:

> WHO IS AN INSURED (Section II) is amended to include as an insured each individual unit owner of the insured condominium, but only with respect to liability arising out of the ownership, maintenance or repair of that portion of the premises which is not reserved for that unit owner's exclusive use or occupancy.

### LEAC's Amended Counterclaim Names Individual Condo Owners as Third Party Defendants

96.     The LEAC Amended Counterclaim named over twenty individuals as Third Party Defendants who advertised their individually-owned condo units for short-term rental services as allowed by the Community Association ("Third Party Defendants"):

60.   . . . Third Party Defendants use LEAC's LAND'S END mark, each individually, to advertise their own individually-owned condos for short-term rental services that includes hotel services, online short-term reservations, and other similar services through rental-by-owner websites, including but not limited to ResortRentals.com and HomeAway.com. **[Amended Counterclaim ¶ 60, p. 14; Exhibit 10]**.

97.   The LEAC Amended Counterclaim uses the following language against all named Third Party Defendants:

81.   . . . [O]n or about May 12, 2016 Third Party Defendant Land's End 10-404 LLC advertised in this District and elsewhere short-term rental services that included hotel services, online short-term reservations, and other similar services, for the condo that it owns, Building 10, #404, on ResortRentals.com using the LAND'S END mark alone without using the full name of the condo property, "Land's End at Sunset Beach." **[Amended Counterclaim ¶ 81, p. 20; Exhibit 10]**.

98.   The same counts of action asserted against Community Association in paragraph 40 of this complaint are asserted against the Third Party Defendants. **[Amended Counterclaim ¶ 90, 95, 96, 99, 104, 105, 108, 113, 114, pp. 21–26, 28; Exhibit "11"]**.

**Aspen's Denial of Coverage Based on Third Party Defendants**

99.   In the Farley July Email. Ms. Farley requests reconsideration of denial based on the LEAC Amended Counterclaim naming the Third Party Defendants:

I am attaching an amended (counter) complaint . . . by LEAC . . . which includes 25+ condo owners as named defendants, alongside the association. In addition to the Condo Association, each of these owners are named insured under your endorsements. **[Farley July Email; Exhibit 12]**.

100.   In Aspen October Denial Letter addressed, for the first time, the Third Party Defendants in their denial of coverage, stating:

27

> Aspen . . . respectfully disagrees with your conclusion that the twenty-five plus condominium owners joined as co-defendants in the Amended Counterclaim qualify as additional insureds under . . . the Policy and applicable endorsement. . . . [**Aspen October Denial Letter, p. 1; Exhibit 13**].

101.     The Aspen October Denial Letter provides no explanation for why the Third Party Defendants are not considered additional insured under the Additional Insureds Endorsement.

102.     On December 22, 2016, Susan Farley requested Aspen reconsider coverage as to the Third Party Defendants and provide reimbursement for the suit's settlement ("Farley December Reimbursement Letter"), a copy of which is attached as **Exhibit "15."**

103.     The Farley December Reimbursement Letter states in part:

> . . . LEAC sued each [Third Party Defendant] personally for advertising injury jointly and severally with the association. These owners had no choice but to use the identity provided by the association in order to identify their condominiums when advertising their units on the internet.  Owners of the associations are insured under your policy for torts emanating from the common elements of the association, and advertising injury is a tort.
>
> We ask you to review this matter and tender for reimbursement to use the costs of defending Land's End . . .

**[Farley December Reimbursement Letter, p. 3–4; Exhibit 15]**.

104.     In light of the provisions of the Additional Insureds Endorsement, form CG 20 04 11 85, referenced in paragraph 93 above, the joint and several liability exposure necessarily implicated insured liability for the individual condominium unit owners as additional insureds.

105.    In a letter dated January 18, 2017, Aspen denied that Ms. Farley's request for reconsideration ("Aspen January Denial Letter"). A copy of the Aspen January Denial Letter is attached as **Exhibit "16**.

106.    In that same letter, Aspen again failed to address why the Third Party Defendants were not considered additional insured under the Additional Insureds Endorsement of the Policy.

### The Individual Condo Owners Named as Third Party Defendants Are Additional Insured Under the Aspen Policy

107.    The Amended Counterclaim alleges that the Third Party Defendants advertised their condo units on ResortRental.com. [*See* **Amended Counterclaim ¶ 60, 81 pp. 14, 20; Exhibit "11"**].

108.    Upon viewing Exhibit "M" of the Community Association Complaint ("Complaint Exhibit "M""), the printout of the available units, titled Vacation Rental List, is linked to the general page advertising Community Association's condominium as "Land's End." A copy of Exhibit "M" of the Community Association Complaint is attached as **Exhibit "17**." [**Complaint Exhibit "M," PageID 92; Exhibit "17"**].

109.    The general page advertises property amenities, such as oversized heated pool, two lighted tennis courts, Shuffle Board, and more. [**Complaint Exhibit "M," PageID 95; Exhibit "17"**]. These common features, which are within the scope of Additional Insured Endorsement, are implicated by the allegations in the LEAC Amended Counterclaim against Third Party Defendants, who rely upon the display and promotion of the amenities to attract potential short term renters.

110.    Moreover, the Third Party Defendants use, in their advertisements, of the Communication Association's "Land's End" name for its condominium is a common interest to all unit owners.

111.    Thus, the Third Party Defendants must be considered additional insured within the meaning of the Policy.

### The Third Party Defendants, as Additional Insured, Created Distinct Alleged Advertisements Occurring Within the Policy Period

112.    Aspen's Policy period is from May 15, 2015 to May 15, 2016, following renewal to May 15, 2017. **[Policy, Form. No. ASIC CIU GL 007D 10 12; Exhibit "1"]**.

113.    LEAC Amended Counterclaim alleges that on or about May 12, 2016, Third Party Defendant 10-404 LLC advertised its condominium on ResortRentals.com using the Land's End mark. **[Amended Counterclaim ¶ 81, p. 20; Exhibit 10]**.

114.    Because the Third Party Defendants are covered as additional insureds under the Additional Insured Endorsement of the Aspen Policy, the "advertisement" of the Third Party Defendants occurred within the first year of the Aspen Policy period.

115.    Consequently, Aspen has a duty to defend the Amended Counterclaim in the *Land's End Suit* against the Third Party Defendants as long as potential coverage arises.

### THE "KNOWLEDGE OF FALSITY" EXCLUSION DOES NOT BAR COVERAGE

116.    The "Knowledge of Falsity" exclusion in the Policy states:

This insurance does not apply to:

. . . .

**b.**  Material Published with Knowledge of Falsity

"Personal and advertisement injury" "Personal and
advertising injury" caused by or at the direction of the
insured with the knowledge that the act would violate the
rights of another and would inflict "personal and
advertising injury"

**[Policy, Exclusion 2(b) p. 6]**; **Exhibit "1"]**.

117.    The knowledge of advertising/personal injury exclusion does not negate the

duty to defend unless there is no potential for liability under the allegations.  So long as the

alleged offenses could be proven without having to demonstrate intent, Land's End's

allegations overcome any intentional act exclusion.

118.    Furthermore, Aspen failed to reassert this exclusion in letters subsequent to its

initial denial in the Aspen May Denial Letter. **[Aspen May Denial Letter; Exhibit "7"]**. As

the LEAC Amended Counterclaim is the operative pleading for coverage analysis, its

incorporation of the same allegations as the LEAC Counterclaim means that the defensed owed

under Aspen's Policy applies to both pleadings. However, after reviewing the Farley's

arguments against this exclusion in the Farley June Reconsideration Letter, Aspen elected not

to reassert this claim. This evidences an intentional relinquishment of a known right, and thus,

is waived.

### THE "INTELLECTUAL PROPERTY" EXCLUSION DOES NOT BAR COVERAGE

#### The Intellectual Property Exclusion

119.    The Intellectual Property Exclusion in the Policy states:

This insurance does not apply to:

. . . .

i.   Infringement of Copyright, Patent, Trademark or Trade Secret

"Personal and advertisement injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement."

However, this exclusion does not apply to infringement, in your "advertisement," of copyright, trade dress or slogan.

**[Policy, Exclusion 2(i) p. 6; Exhibit "1"]**.

### The Intellectual Property Exclusion Is Inapplicable To Offense (f)

<u>Unfair Competition Claims Are Not Dependent On Proof of Trademark Infringement</u>

120.   The claim for unfair competition, which implicates potential coverage under offense (f) is expressly outside the scope of the Intellectual Property Exclusion, as anticipated by Aspen's policy language which expressly contemplates coverage for claims like those asserted against Land's End in tandem with intellectual property allegations through the provision stating: "other intellectual property rights do not include the use of another's advertising idea in your 'advertisement.'"

121.   The unfair competition claims create potential liability within offense (f) where it is asserted in Count IV for Unfair Competition premised on allegations which do not depends on proof of trademark infringement violations:

113.   Counterclaim-Defendants' and Third Party Defendants' [failure to use "LAND'S END"] . . . without using their full name of "Land's End at Sunset Beach" . . . is deceptive conduct within . . . Florida common law.

114. LEAC has been damaged by Counterclaim-Defendants' and Third Party Defendants' unfair competition by reason of the likelihood of confusion as to

the source . . . of Counterclaim-Defendants' and Third Party
Defendants' services . . . and the relationship . . . to LEAC.

**[Amended Counterclaim ¶¶ 113–114, p. 28; Exhibit 10]**.

122.    Based on the claims' language, it is possible to be liable for unfair competition
even when trademark infringement is not present if use of a similar but non-infringing mark or
device is combined with unfair practices in a manner which is likely to deceive purchasers
regarding the origin of goods under all the circumstances.

<u>Potential Liability For Unfair Competition Arises Even If The Land's End Mark Is
Unenforceable</u>

123.    In the alternative, even for those claims premised on trademark infringement,
potential coverage arises even if there is no basis for trademark infringement:

(a) The Community Association Complaint alleges that the trademark infringement
claims are found not to extend to the regional use by Land's End, which predated
LEAC's federal registration for asserted trademarks:

> 50. All of the Asserted Registrations owned by LEAC
> arose . . . many years . . . after [Community Association]
> began . . . using . . . LAND'S END to refer to its condos,
> throughout the State of Florida . . .

> 51. At no time before [Community Association's] use
> of . . . LAND'S END did [LEAC] use the term in or
> anywhere near . . . Florida . . .

> 52. [Community Association] began using . . . LAND'S
> END on the Gulf Coast of Florida, including on the internet,
> long before they had any knowledge of any use of the
> phrase LAND'S END by [LEAC].

**[Community Association Complaint ¶¶ 51–52, p. 14; Exhibit 6]**.

(b) The Community Association Complaint also alleges that LEAC failed to acquire the necessary secondary meaning in Florida, where Community Association uses "Land's End" in its advertisements:

> 62. The actual or potential renters . . . of the [Community Association] condos, in the State of Florida . . . do not associate the term LAND'S END with any of the services offered by [LEAC] or identified in LEAC's registrations or consider it an indication of a source or origin of such services, nor did they when Land's End, its members, and their agents began using the term Land's End in reference to the [Community Association] condos.

> 63. The descriptive nature of [LEAC's] mark renders it weak and deserving of . . . a very narrow scope of potential, and the absence of secondary meaning of the mark in [Community Association's] territory of use deprives it of protectability sufficient to displace [Community Association's] prior use there.

**[Community Association Complaint ¶¶ 62–63, p. 18; Exhibit 6]**.

(c) On August 5, 2016, Community Association filed a Motion to Dismiss All of Defendant's Amended Counterclaims ("Motion to Dismiss"). A copy of the Motion to Dismiss, excluding its attached exhibits, is attached as **Exhibit "18."** In its Motion to Dismiss, Community Association asserts that LEAC failed to present a likelihood of entry into Community Association's territory that is geographically remote from LEAC's main territory:

> LEAC has not alleged any present likelihood of entry into Florida from Alaska.

**[Motion to Dismiss, p. 25; Exhibit "18"]**.

124.   Although not necessary to establish potential coverage exists that is not dependent on trademark infringement. Subsequent rulings by the court clarifies the viability

of the asserted claims challenging the trademark infringement allegations as well as vindicate the affirmative defenses of the counterclaim.

### Offense (g) Falls Under The Exception for The Intellectual Property Exclusion

125.    The intellectual property exclusion expressly exceptions slogan infringement in your "advertisement" under offense (g) from the exclusion.

126.    As "infringement of slogan in your 'advertisement' coverage is factually implicated by the claims here. Thus, the exclusion cannot bar coverage under offense (g).

### SETTLEMENT OF THE LAND'S END SUIT AND ASPEN'S FINAL DENIAL

### Settlement of the Underlying Action Required No Payment of Monies

127.    On November 16, 2016, the Court entered a Final Judgment of Trademark Non-Infringement and Permanent Injunction Against Interference with Use ("Final Judgment") against LEAC. A copy of the Final Judgment is attached as **Exhibit "19**."

128.    The Final Judgment ruled that Community Association did not infringe upon LEAC's trademark rights, and that no payment of monies was required from either side. **[Final Judgment, ¶ 2, 4, p. 4–5; Exhibit "19"]**.

129.    A Settlement Agreement restating the terms of the Final Judgment was signed by all parties in November 2016. A copy of the Settlement Agreement is attached as **Exhibit "20**."

### Aspen Denies Community Association's Request For Reimbursement Following Settlement Of The *Land's End Suit*

130.    Ms. Farley, in the Farley December Reimbursement Letter, notified Aspen that the underlying *Land's End Suit* against Community Association had resolved successfully and reiterated the reasons why a declaratory relief action was necessary:

Despite providing LEAC's counsel with detailed legal reasoning and evidence exposing the fundamental flaws with its claims, LEAC stated in writing it was not going to "go away" and legal action was imminent. Thus, the insured filed a Declaratory Judgment action for non-infringement in Federal Court in Tampa . . . to prevent being sued in Alaska or . . . California.

**[Farley December Reimbursement Letter, p. 3; Exhibit "15"]**.

131.    In the Aspen January Denial Letter, Aspen again denied that coverage arose for the LEAC Amended Counterclaim:

It is undeniable the use and alleged infringement of the _trademarks, LAND's END and LAND's END RESORT_, were the focus of the trademark lawsuit filed by LEAC.

. . . At no time, did the lawsuit filed by LEAC allege "copyright", "trade dress" or "trade slogan" in the Named Insured's advertisement.

. . . .

. . . Aspen . . . must deny . . . the Named Insured's request for reimbursement of all legal fees incurred by the Named Insured in defending the underlying trademark claims filed by LEAC.

**[Aspen January Denial Letter, p. 4–5; Exhibit "16"]**.

## COUNT I

### Declaratory Relief – Duty to Defend

132.    Community Association incorporates the allegations in the above paragraphs of this Complaint as though fully alleged herein.

133.    Valid contracts existed between Community Association and Aspen, namely the Policy.

134.    Community Association fully performed all of the obligations and conditions to be performed by it under the Policy, or has been excused from performing them as a result of Aspen's breach of its duty to defend.

135.    By selling the Policy, Aspen agreed to provide a defense for suits seeking damages for "personal and advertising injury" offenses as defined in the Policy.

136.    Community Association contends that the underlying *Land's End Suit* LEAC Amended Counterclaim alleges facts implicating the "personal and advertising injury" coverage under the Policy, thereby triggering Aspen's obligation to defend Community Association.

137.    Aspen disputes the foregoing contentions and has steadfastly refused to defend Community Association in the *Land's End Suit.*  Community Association reasonably expected Aspen to protect it from the risk of loss for covered "advertising injury" claims against it.

138.    Aspen has denied and continues to deny that the *Land's End Suit* complaints allege facts implicating coverage the Policy, or state claims even potentially covered under the Policy, and has refused to defend Community Association in the *Land's End Suit*.

139.    Aspen breached its duty to defend the *Land's End Suit* by failing to provide a defense.  In failing and refusing to defend Community Association in the *Land's End Suit*, Aspen materially breached its defense obligations under the Policy.

140.    Aspen has fully performed all of the obligations and conditions to be performed by it under its Primary Policy and/or have been excused from performing as a result of Aspen's breach of its duty to defend.

141.    As a direct and proximate result of the breach by Aspen of its duty to defend, Community Association has suffered damages in the form of:

(a)    unreimbursed attorneys' fees and costs incurred in the *Land's End Suit.*

(b)    unreimbursed costs incurred in settlement of the *Land's End Suit.*

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Community Association prays for judgment against Defendant Aspen as follows:

1.    A judicial declaration that Aspen had a duty to defend and now has a duty to indemnify Community Association in the *Land's End Suit.*

2.    A determination and award of general damages consisting of all reasonable defense expenses and settlement expenses incurred by Community Association in defense of the underlying *Land's End Suit;*

3.    Award of pre-judgment interest accruing from the date of each defense invoice or any settlement payment at the statutory interest rate of 10% per annum;

4.    Award of attorneys' fees incurred in this action and costs of suit herein;

5.    Such other and further relief as this Court may deem just and proper.

Dated:  July 20, 2017

      /s/  Frank R. Jakes
Frank R. Jakes, Esq. FBN 0372226
**Johnson, Pope, Bokor, Ruppel & Burns, LLP**
403 E. Madison St., 4th Floor
Tampa, FL 33602
(813) 225-2500 (Telephone)
(904) 355-1797 (Facsimile)
E-Mail:  Frankj@jpfirm.com
*Attorneys for Plaintiff, Land's End at Sunset Beach Community Association, Inc.*

David A. Gauntlett *(pro hac vice-to be filed)*
James A. Lowe *(pro hac vice-to be filed)*
**Gauntlett & Associates**
18400 Von Karman, Suite 300
Irvine, CA  92612
(949) 553-1010 (Telephone)
(949) 553-2050 (Facsimile)
dag@gauntlettlaw.com
jal@gauntlettlaw.com